UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

TARYN BALDWIN,

                                        Plaintiff,

                    -v-

TMPL LEXINGTON LLC, *et al.*,

                                        Defendants.

---

23 Civ. 9899 (PAE)

<u>OPINION & ORDER</u>

PAUL A. ENGELMAYER, District Judge:

This decision resolves motions to compel arbitration and to dismiss.  Plaintiff Taryn Baldwin ("Baldwin") sues her employers: TMPL Lexington LLC ("TMPL"), Empire Holdings and Investments, LLC ("Empire"), and Patrick Walsh, the chief executive and owner of Empire and TMPL.  Her nine claims allege sex discrimination under the New York State Human Rights Law, N.Y. Exec. Law §§ 290 *et seq.* ("NYSHRL"), and the New York City Human Rights Law, N.Y.C. Admin. Code §§ 8-502(a) *et seq.* ("NYCHRL"); unpaid minimum wages under New York Labor Law, N.Y. Lab. Law §§ 650 *et seq.* ("NYLL"); unpaid overtime wages under NYLL and the Fair Labor Standards Act, 29 U.S.C. §§ 201 *et seq.* ("FLSA"); failure to provide wage statements and notices under NYLL; and failure to pay timely wages under NYLL.  She also alleges that Walsh sexually harassed and assaulted her, in violation of the Gender Motivated Violence Protection Act, N.Y.C. Admin. Code §§ 10-1101 *et seq.* ("GMVPA").

Defendants move to compel arbitration of the FLSA and NYLL claims, and to dismiss all claims under Federal Rule of Civil Procedure 12(b)(1) and the GMVPA claim under Rule 12(b)(6).  For the following reasons, the Court denies the motions to compel arbitration and to dismiss.

## I.    Factual Background[1]

### A.    The Parties

Empire is a Florida limited liability holding company that acquires, develops, and operates boutique luxury fitness clubs across the United States.  Dkt. 19 ("AC") ¶¶ 16–17.  It is the parent company of TMPL, a Delaware corporation, that operates five luxury fitness centers in New York.  *Id.*  ¶¶ 18, 19, 24–25.  One such fitness center is TMPL Lexington, located at 155 East 53rd Street in Manhattan.  *Id.* ¶ 24.  Patrick Walsh is the chief executive officer and owner of Empire and TMPL.  *Id.* ¶ 30.

Baldwin is a personal trainer living in Manhattan.  *Id.* ¶¶ 2, 13.  She worked as a personal trainer at TMPL's gyms between January 2022 and September 2023.  *Id.* ¶ 14.

### B.    Walsh's Alleged Sex Discrimination and Gender-Based Violence Against Baldwin

#### 1.    Baldwin Begins Working for TMPL

In January 2022, Baldwin began working as a personal trainer at the TMPL gyms in New York.  *Id.* ¶¶ 44, 46.  Although new to personal training, Baldwin was successful in her role.  *Id.* ¶ 47.  She was repeatedly ranked the number one female trainer at TMPL Lexington, and at one point, held the title of number two female trainer of all TMPL gyms.  *Id.* ¶ 49.

---

[1] The Court draws the facts in this decision principally from the Amended Complaint, Dkt. 19 ("AC" or "Amended Complaint"), and the arbitration agreement incorporated by reference, Dkt. 20, Ex. 2 ("Arbitration Agreement").  For the purposes of resolving the motions to dismiss, the Court assumes all well-pled facts in the AC to be true and draws all reasonable inferences in favor of plaintiffs.  *See Koch v. Christie's Int'l PLC*, 699 F.3d 141, 145 (2d Cir. 2012).  A Court may generally consider affidavits and other evidence outside the pleadings in deciding a motion under Rule 12(b)(1), *see Clarex Ltd. v. Natixis Sec. Am. LLC*, No. 12 Civ. 0722 (PAE), 2012 WL 4849146, at *2 (S.D.N.Y. Oct. 12, 2012), but none have been submitted here.

2.    **Baldwin's Interactions with Walsh**

While Baldwin was employed at TMPL, Walsh regularly visited the TMPL gyms in New York. *Id.* ¶ 23. He spent significant time at TMPL Lexington, as it is TMPL's flagship location, with a 24,000-square-foot facility, and a first-of-its kind recovery spa that opened in May 2022. *Id.* ¶ 39. Walsh was intimately involved in personnel decisions and gym management. He communicated with TMPL's executive team, held weekly meetings with TMPL gyms' leadership, and helped supervise personal trainers and other staff at TMPL gyms. *Id.* ¶¶ 37–38.

In May 2022, Walsh spoke to Baldwin for the first time, at the gym. *Id.* ¶ 51. A few days after, Walsh asked Steven Putkowski, Baldwin's manager, for Baldwin's cell phone number. *Id.* ¶ 53. On May 30, 2022, he texted her for the first time. *Id.* ¶¶ 2, 52. Walsh's initial texts to Baldwin were work-related. For example, he texted her about the upcoming grand opening of the spa at TML Lexington and asked her to post photos of herself at the spa on her Instagram account for extra publicity. *Id.* ¶ 54. On May 31, 2022, however, Walsh texted Baldwin that he needed "an exclusive on all [her] hot pics," which made her feel "troubled and uncomfortable." *Id.* ¶¶ 55–56. On June 9, 2022, Walsh asked Baldwin to film a video with her twin sister at the spa and invited them to visit him in Palm Beach, Florida. *Id.* ¶ 57.

On June 21, 2022, Walsh asked Baldwin to train him for the first time. *Id.* ¶¶ 58–59. Although reluctant to do so, she agreed because she felt "required to comply with his request." *Id.* ¶ 59. She trained Walsh in summer and fall 2022, and then again in June and August 2023. *Id.* ¶¶ 59–60. During their training sessions, Walsh regularly made comments about Baldwin's body and held her hands when she passed him gym equipment. *Id.* ¶ 61.

On or around August 8, 2022, Baldwin scheduled a meeting with Putkowski to tell him she no longer wanted to train Walsh because he made her feel uncomfortable. *Id.* ¶¶ 63–64. Putwoski disregarded her concerns, and to Baldwin's shock, suggested that she try to date Walsh

instead.  *Id.* ¶¶ 65–66.  Feeling "completely unsupported," Baldwin continued training Walsh

against her wishes.  *Id.* ¶ 66.

Afterwards, several coworkers commented that Walsh had previously dated at least two

other TMPL employees.  *Id.* ¶¶ 67–68.  Baldwin, who is blonde, also overheard Putkowski tell

another trainer that Walsh "likes blondes."  *Id.* ¶ 69.  The rumors about Walsh's dating history

and preferences made Baldwin more uneasy about interacting with him regularly.  *Id.* ¶ 71.

### 3.    Walsh's Repeated Attempts to Spend Time with Baldwin Outside of Work

In July 2022, Walsh began texting Baldwin on a nearly daily basis about non-work-

related matters.  *Id.* ¶ 72.  Baldwin did not want to substantively engage with Walsh but

responded "politely" to appease him.  *Id.* ¶ 74.  He also attempted to spend time with Baldwin

outside of work.  *Id.* ¶¶ 75–76.  Between July and August 2022, Walsh asked to meet Baldwin

for dinner and/or drinks a total of 12 times.  *Id.* ¶ 77.  Baldwin agreed to meet him four times.

*Id.* ¶ 78.

#### a.    *The August 12, 2022 Incident*

On August 12, 2022, Baldwin agreed to meet Walsh for dinner at his brother's apartment

in Manhattan to discuss work and social media strategies.  *Id.* ¶¶ 79–81.  Baldwin was hopeful

that it would be a working dinner leading to new opportunities for her at TMPL.  *Id.* ¶ 82.  But

the two did not discuss work at the dinner.  After the meal, Walsh invited Baldwin to stay and

watch a horror movie with him.  *Id.* ¶¶ 84–85.  Baldwin was reluctant, but agreed after he

insisted she stay.  *Id.* ¶ 86.  During the movie, Baldwin sat as far away from Walsh as possible

on the couch, but once the movie started, he moved close to her.  *Id.* ¶ 87.  As the movie played,

Walsh "put his arms around [Baldwin] and began kissing her."  *Id.*  He proceeded to "reach[] his

hands under her clothing," touching her breasts in the process.  *Id.* ¶¶ 87–88.  He then "tried to

lower her pants" and "touched her vulva over her pants." *Id.* ¶¶ 87, 89. Baldwin did not want to be kissed or touched by Walsh. *Id.* ¶¶ 90–91. She quickly rose and asked Walsh to order her an Uber to go home. *Id.* ¶ 94. He complied. *Id.* ¶ 95. Later that night, Walsh texted Baldwin, asking if she arrived home safely. *Id.* ¶ 96. He did not apologize or acknowledge his sexual advances. *Id.*

Baldwin felt ashamed and scared after the incident. *Id.* ¶ 98. She felt embarrassed about putting herself in a situation that made it easy for Wash to prey on her. *Id.* Afterwards, she was afraid to tell coworkers about the incident, feeling she would be blamed for having gone to the apartment. *Id.* ¶ 99. Instead, she spoke to coworkers in more general terms about how Walsh made her feel uncomfortable in their training sessions. *Id.* ¶¶ 100–01. Baldwin did confide in her sister and friends that Walsh had sexually assaulted her on August 12, 2022. *Id.* ¶ 100.

In late August 2022, Baldwin's coworker told TMPL manager, Jane Nielsen, that Walsh had been sending Baldwin inappropriate text messages, hitting on her, and generally making her feel uncomfortable. *Id.* ¶ 102. Nielson told the coworker that he should "mind his business" and "stop gossiping." *Id.* Around August 30, 2022, Putkowski, Baldwin's manager, learned that Baldwin had expressed discomfort and frustration at training Walsh. *Id.* ¶ 103. Putkowski admonished Baldwin for gossiping and instructed her to stop talking about her issues with other TMPL employees. *Id.* ¶ 104. Neither manager investigated Baldwin's complaints about Walsh. *Id.* ¶ 106. Their behavior confirmed Baldwin's "belief that she could not turn to or trust TMPL's management to protect her interests." *Id.* ¶108.

Following the August 12 incident, Baldwin also "made it a point not to meet with Walsh alone outside of TMPL." *Id.* ¶ 129. She intentionally "avoided Walsh at TMPL as much as possible." *Id.* ¶ 130. However, Walsh contacted Baldwin to continue scheduling additional

personal training sessions with her.  *Id.* ¶ 131.  Baldwin complied "because she felt she had to since he was the boss."  *Id.* ¶ 133.  Despite Baldwin's attempts to avoid Walsh, he continued to invite her out, both via text message and during their personal training sessions.  *Id.* ¶ 135. Baldwin declined his invitations, with one exception.  *Id.*  In October 2022, Baldwin agreed to get dinner with Walsh because he specifically requested that both Baldwin and her twin sister meet with him to talk about social media strategy and marketing ideas.  *Id.* ¶ 136.  Despite having significant reservations about spending more time with Walsh, Baldwin agreed for her sister's sake, not wanting her to miss out on a potentially important career networking opportunity.  *Id.* ¶ 137.  No job or networking opportunities came about from this dinner.  *Id.*

### 4.    The December 2022 Promotional Photo and Video Shoot for TMPL

In December 2022, Sydney Bakich, TMPL's brand director, invited Baldwin to be in a promotional photo and video shoot for TMPL gyms.  *Id.* ¶ 109.  Baldwin agreed to participate. At the shoot, however, she felt uncomfortable because "she quickly realized that the goal was to get 'sexy' images of [her]."  *Id.* ¶ 112.  Bakich directed Baldwin "to squeeze her breasts together while posing," repeatedly exclaimed that "it's all about the ass," and directed the camera towards Baldwin's backside.  *Id.* ¶ 113.  Feeling objectified during the shoot, Baldwin later told Bakich that she did not want the photographs and videos of her to be used.  *Id.* ¶ 114.  Bakich responded that she "cannot scrap an entire shoot," which pressured Baldwin to approve the use of several photographs.  *Id.*  ¶¶ 115–17.  To Baldwin's dismay and "significant humiliation," TMPL not only published the photographs she had approved, but also shared a video from the shoot on TMPL's website and social media platforms.  *Id.* ¶¶ 118–25.  Baldwin had explicitly asked for the video to not be shared online because she felt it "overtly sexual" in nature.  *Id.* ¶¶ 118–21. Defendants deleted the video only after Baldwin spoke to Putkowski and insisted on its removal. *Id.* ¶¶ 124–25.

Baldwin "felt hurt and disrespected" by TMPL's "failure to respect her requests and failure to respect her body." *Id.* ¶¶ 125–26.  The AC also alleges, upon information and belief, that Walsh told Bakich to involve Baldwin in the photoshoot "because he wanted sexually revealing photos and videos" of her. *Id.* ¶ 127.

**5.      Baldwin's Meeting with Walsh on January 27, 2023, and Subsequent Interactions**

On January 27, 2023, Walsh asked Baldwin to meet him at TMPL Lexington to discuss Pilates. *Id.* ¶ 139.  Because the meeting was to take place at her workplace during the workday, Baldwin agreed to meet with Walsh. *Id.* ¶ 140.  At the meeting, Walsh offered Baldwin an opportunity to lead the Pilates studio at a new TMPL location he would be opening in 2024. *Id.* Excited by the opportunity, Baldwin researched Pilates certification courses and equipment options for use in the studio and shared her research with Walsh. *Id.* ¶¶ 142–43.  Walsh did not take any official steps toward building the studio or setting up a Pilates program at any TMPL gyms. *Id.* ¶ 143.  Baldwin came to believe that Walsh fabricated the opportunity in an effort to reconnect with her. *Id.* ¶¶ 139, 144.

Afterwards, Baldwin continued to keep her distance from Walsh. *Id.* ¶ 145.  However, he continued to text her about non-work-related matters, including by sending her selfies, family vacation photos, and regularly commenting on her physique. *Id.*  For example, on May 31, 2023, he wrote "Taryn, u r looking amazing 😆 as always. Love u in the tmpl top 🔥 Have a great week!  Look fwd to training next time. . ." *Id.* ¶ 146.

**6.      August 2023: Baldwin Signs the Arbitration Agreement**

On August 23, 2023, Baldwin executed an arbitration agreement with defendants.  It provides: "All disputes shall be finally and conclusively resolved by final and binding arbitration before a neutral third party.  This Agreement does not apply to any litigation pending at the time

of execution." Arbitration Agreement at 2. The agreement defined "dispute" as "any and all claims or controversies alleging violations of federal, state, local or common law between an Employee and the Company (and vice versa) arising out of or in any way related to the application for employment, employment or cessation of employment with the Company, including all previously unasserted claims prior to the date of this Agreement." *Id.* at 1. The AC does not plead why this agreement was entered into late in Baldwin's employment.[2]

### 7.    September 2023: Baldwin Quits TMPL

From her efforts to avoid Walsh at work, Baldwin felt "exhausted and drained." ¶ 148. She "felt anxiety going into TMPL" and "constantly felt on edge when communicating with Walsh, in person and over text message." *Id.* ¶¶ 150–51. She worked in fear that "Walsh would try to kiss and/or grope her again." *Id.* ¶ 155. On September 29, 2023, Baldwin quit, feeling "that she had no other choice." *Id.* ¶¶ 153, 157.

### C.    Defendants' Wage Payment and Wage Notice Violations

The AC alleges that defendants committed wage payment and wage notice violations. These are alleged to have occurred throughout Baldwin's employment.

### 1.    Floor Hour Payments

At TMPL, personal trainers were paid for every training session they completed with a client. *Id.* ¶ 159. TMPL also paid personal trainers for "floor hours," when trainers would clean the gym, organize equipment, talk with clients at the gym, and call potential clients to discuss personal training options. *Id.* ¶ 163. The floor hours were paid at New York's statutory minimum hourly wage rate of $15. When Baldwin began employment at TMPL, her managers told her that, in addition to personal training sessions, she was required to complete 15 to 20

---

[2] The parties' briefs also do not address this.

floor hours per week. *Id.* ¶ 167. Although Baldwin "consistently complied with the requirement to complete floor hours," TMPL did not accurately track her hours or pay her based on hours worked. *Id.* ¶¶ 168, 170, 172, 174, 184. In fact, Baldwin was told that it was TMPL's policy to pay for a maximum of 20 floor hours per week. *Id.* ¶ 173. For example, between January and April 2022, she completed approximately 25 floor hours per week, but was only compensated for 20 hours. *Id.* ¶ 176.

Around January 2023, Baldwin asked Putkowski if she could stop doing weekly floor hours, to enable her to spend less time at the gym to avoid interacting with Walsh. *Id.* ¶¶ 190, 193. Putkowski agreed and relieved her of the floor hours requirement. *Id.* ¶ 191. Nevertheless, she continued doing floor hour work on a weekly basis—cleaning the gym before and after training sessions and regularly calling actual and prospective clients. *Id.* ¶ 195. Although managers acknowledged her work, in January 2023, TMPL ceased paying her for floor hours. *Id.* ¶¶ 197, 199, 201. Between January and September 2023, Baldwin "regularly completed about ten hours of floor hours per week" but was unpaid for this work. *Id.* ¶ 203. Throughout 2022 and early 2023, TMPL also failed to pay Baldwin for photo and video shoots that were used to promote TMPL's gyms. *Id.* ¶¶ 204–06.

At various points in Baldwin's employment, TMPL also withheld overtime wages from her, *id.* ¶¶ 183, 208, failed to provide her with written wage notices or accurate wage statements, *id.* ¶¶ 211–12, and failed to pay her in a timely manner, *id.* ¶ 259.

## II.    Procedural History

On November 9, 2023, Baldwin filed the Complaint. Dkt. 1. On January 12, 2024, defendants filed motions to compel arbitration, or, in the alternative, to dismiss. Dkt. 16. On January 16, 2024, the Court issued an amend or oppose order. Dkt. 18. On February 2, 2024, Baldwin filed the AC, the operative complaint today. On February 16, 2024, defendants filed

motions to compel arbitration or dismiss the AC, Dkt. 20, and a memorandum of law in support, Dkt. 21 ("Def. Mem."). On March 11, 2024, Baldwin filed an opposition. Dkt. 24 ("Pl. Opp."). On March 25, 2024, defendants filed a reply. Dkt. 25 ("Reply").

## III.    Motion to Compel Arbitration

### A.    Applicable Legal Standard

The Federal Arbitration Act ("FAA"), 9 U.S.C. §§ 1 *et seq.*, "creates a body of federal substantive law establishing and regulating the duty to honor an agreement to arbitrate." *Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*, 473 U.S. 614, 625 (1985) (internal quotation marks omitted). It provides that an arbitration agreement "shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2. The FAA establishes that for contractual issues being adjudicated under federal law, "any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration." *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24–25 (1983). The FAA was enacted to reverse "centuries of judicial hostility to arbitration agreements" and "to place arbitration agreements upon the same footings as other contracts." *Scherk v. Alberto-Culver Co.*, 417 U.S. 506, 510–11 (1974) (internal quotation marks omitted).

Were it not for the Ending Forced Arbitration of Sexual Assault and Sexual Harassment Act of 2021 ("EFAA"), Pub. L. No. 117-90, 135 Stat. 26, *codified* 9 U.S.C. §§ 401–02. Baldwin's would be required to resolve her claims in arbitration per the binding arbitration agreement she signed with TMPL. The EFAA, however, amends the FAA as follows:

> Notwithstanding any other provision of this title, at the election of the person alleging conduct constituting a sexual harassment dispute or sexual assault dispute, or the named representative of a class or in a collective action alleging such conduct, no predispute arbitration agreement or predispute joint-action waiver shall be valid or enforceable with respect to a case which is filed under Federal, Tribal, or State law and relates to the sexual assault dispute or the sexual harassment dispute.

9 U.S.C. § 402(a).  The EFAA defines a "sexual harassment dispute" as "a dispute relating to conduct that is alleged to constitute sexual harassment under applicable Federal, Tribal, or State law." *Id.* § 401(4).  It defines a "sexual assault dispute" as "a dispute involving a nonconsensual sexual act or sexual contact, as such terms are defined in section 2246 of title 18 or similar applicable Tribal or State law, including when the victim lacks capacity to consent." *Id.* § 401(3).  A court, rather than an arbitrator, determines whether the EFAA applies, "irrespective of whether the party resisting arbitration challenges the arbitration agreement" and "irrespective of whether the agreement purports to delegate such determinations to an arbitrator."  9 U.S.C. § 402(b).  Alleged claims must have "accrued on or after March 3, 2022"; "[the EFAA] does not have retroactive effect." *Johnson v. Everyrealm, Inc.*, 657 F. Supp. 3d 535, 550 (S.D.N.Y. 2023).

**B.    Discussion**

Defendants move to compel arbitration of a subset of Baldwin's claims: those alleging FLSA and NYLL violations.  These claims allege that defendants failed to pay Baldwin minimum and overtime wages, to pay her timely wages, and to provide her with wage statements and notices.

In moving to compel arbitration of these claims, defendants argue that these fall within the parties' arbitration agreement, under which "[a]ll disputes shall be finally and conclusively resolved by final and binding arbitration before a neutral third party."  Arbitration Agreement at 2.  Baldwin counters that the EFAA blocks arbitration of these claims.  Because the AC plausibly pleads claims of sexual harassment and because the EFAA applies to "cases" containing sexual harassment claims and not merely such claims themselves, and because the claims in the AC all

11

implicate conduct after the EFAA's effective date, she argues, the FLSA and NYLL claims must also be resolved in court.

The motion to compel arbitration thus presents, in sequence, two issues. The first is whether the AC "alleg[es] conduct constituting a sexual harassment dispute or sexual assault dispute," so as to come within the EFFA. 9 U.S.C. § 402(a). The second is whether the EFAA renders the arbitration agreement unenforceable as to the entirety of the AC's claims, or only as to its sexual harassment/assault claims. Baldwin is correct on both issues.

### 1.    Whether AC Plausibly Pleads Conduct Constituting Sexual Harassment

The first issue—whether the AC plausibly pleads conduct constituting sexual harassment—is easily resolved. Defendants have not moved to dismiss the AC's sexual harassment claims under the NYSHRL and the NYCHRL.[3] And these claims, the Court finds, are plausibly pled.

The Court need only examine the AC's claim under the NYCHRL, which supplies the most lenient liability standard. To plead sexual harassment under the NYCHRL, a plaintiff need only allege facts showing that she "was subject[] to 'unwanted gender-based conduct.'" *McHenry v. Fox News Network, LLC*, 510 F. Supp. 3d 51, 66 (S.D.N.Y. 2020) (quoting *Erasmus v. Deutsche Bank Ams. Holding Corp.*, No. 15 Civ. 1398 (PAE), 2015 WL 7736554, at *7 (S.D.N.Y. Nov. 30, 2015)).

The AC easily clears this bar. It pleads that Baldwin was repeatedly subject to gender-based conduct by Walsh. It alleges not only that Walsh groped Baldwin against her will, but that, over a period of months, he made sexual advances to Baldwin, sent her inappropriate text messages, made unsolicited comments about her body, and repeatedly pressed to go on dates

---

[3] Defendants do move to dismiss the AC's sexual assault claim under the GMVPA. *See* Def. Mem at 7–10. The Court resolves that motion *infra*.

with her.  *See, e.g.*, *McHenry*, 510 F. Supp. 3d at 69–70 (sustaining NYCHRL sexual harassment

claim based on AC's allegations "that on multiple occasions Murdoch sent McHenry sexually

explicit, unwanted text messages" and that "Murdoch doctored photos to make it appear that

McHenry had sent him an image of herself with 'her cleavage and nearly bare breast shown'");

*Mitura v. Finco Servs., Inc*., No. 23 Civ. 2879 (VEC), 2024 WL 232323, at *4 (S.D.N.Y. Jan. 22,

2024), *reconsideration denied*, 2024 WL 1160643 (S.D.N.Y. Mar. 18, 2024) (sustaining

NYCHRL and NYSHRL sexual harassment claims based on allegations that "Plaintiff was

subjected to weekly, degrading comments and insults, including being called 'a single woman,'

an 'old woman,' and an 'old Asian woman with no kids'"); *Friederick v. Passfeed, Inc*., No. 21

Civ. 2066 (RA), 2022 WL 992798, at *8 (S.D.N.Y. Mar. 31, 2022) (sustaining NYCHRL and

NYSHRL sexual harassment claims based on allegations that "the day after [plaintiff] did not

accept [defendant's] invitation to go to the museum with him, he allegedly refused to look at a

work project that she presented to him and ignored her for the remainder of the day" and "later

reassigned one of her writing assignments to another [] employee"); *Riggs v. Akamai Techs.*, No.

23 Civ. 06463 (LTS), 2024 WL 3347032, at *4 (S.D.N.Y. July 8, 2024) (sustaining NYCHRL

and NYSHRL sexual harassment claims based on allegations that plaintiff's supervisor and

colleagues disparaged her work capacities based on gendered stereotypes, targeted her with

"vulgar, sexual questions," and "explicitly jok[ed] about her private relationships and [made]

unsolicited comments about her sex life").[4]

---

[4] Until 2019, the NYSHRL set a more demanding liability standard than the NYCHRL, keyed to
that of Title VII of the Civil Rights Act of 1964.  In August 2019, the NYSHRL was amended to
direct courts to construe the NYSHRL, like the NYCHRL, "liberally for the accomplishment of
the remedial purposes thereof, regardless of whether federal civil rights laws, including those
laws with provisions worded comparably to the provisions of [the NYSHRL] have been so
construed."  N.Y. Exec. Law § 300.  This language brought the NYSHRL standards closer to

> **2.    Whether the Arbitration Agreement is Unenforceable Only as to the AC's Sexual Harassment Claims or as to the Entire Case**

Having found that the EFAA applies to the AC's sexual harassment claims, the Court must next determine whether the arbitration agreement is enforceable as to the remaining claims. This Court's decision in *Johnson v. Everyrealm, supra*, guides this inquiry.

*Johnson* presented the question—of first impression—whether the EFAA freed from arbitration only the sexual harassment claims or the broader case. Construing the statutory text, the Court held that "the EFAA [] render[s] an arbitration clause unenforceable *as to the entire case* involving a viably pled sexual harassment dispute, as opposed to merely the claims in the case that pertain to the alleged sexual harassment." 657 F. Supp. 3d at 540 (emphasis added). The Court explained that the EFAA's operative text makes a pre-dispute arbitration agreement invalid and unenforceable "with respect to a *case* which is filed under Federal, Tribal, or State law and relates to the . . . sexual harassment dispute." *Id*. at 550 (citing 9 U.S.C. § 402(a) ("no predispute arbitration agreement . . . shall be valid or enforceable *with respect to a case* which is filed under Federal, Tribal, or State law and relates to the sexual assault dispute or the sexual harassment dipuste" (emphasis added))). Relying on dictionary definitions, statutory context, and case law, the Court found that the term "case" unambiguously referred to a legal proceeding as an undivided whole, and did not differentiate among the causes of action within it. Accordingly, *Johnson* held, the EFAA's invalidation of an arbitration agreement applies with respect to an entire case, rather than the discrete sexual harassment claims that form part of the dispute. *Id.* at 558.

---

those under the NYCHRL.  It is as yet unclear whether these two standards are co-extensive, or whether the NYSHRL requires something in between federal and local law for discrimination claims.  *See Yost v. Everyrealm Inc.*, 657 F. Supp. 3d 563, 578 (S.D.N.Y. 2023).  Regardless, the AC's allegations satisfy any reasonably conceivable construction of the NYSHRL standard.

*Johnson*'s holding has been widely followed by courts in this District. *See, e.g., Delo v. Paul Taylor Dance Found., Inc.*, 685 F. Supp. 3d 173, 180, 185 (S.D.N.Y. 2023) (agreeing with *Johnson* "that, where a dispute presents multiple claims—some related to sexual harassment, others not—the EFAA blocks arbitration of the entire case, not just the sexual harassment claims," and holding that because plaintiff "has, at the very least, plausibly pled sexual harassment violations of the NYCHRL, the EFAA applies to block arbitration of all her claims"); *Mitura v. Finco Servs., Inc.*, No. 23 Civ. 2879 (VEC), 2024 WL 232323, at *5 (S.D.N.Y. Jan. 22, 2024), *reconsideration denied*,  2024 WL 1160643 (S.D.N.Y. Mar. 18, 2024) (finding EFAA blocks arbitration "with respect to all claims in the Amended Complaint"); *cf. Olivieri v. Stifel, Nicolaus & Co., Inc.*, No. 23 Civ. 658, 2024 WL 3747609, at *15 (2d Cir. Aug. 12, 2024) (holding that EFAA applies to retaliation claims because "retaliation resulting from a report of sexual harassment is 'relat[ed] to conduct that is alleged to constitute sexual harassment'" (citing 9 U.S.C. § 401(4); *Johnson*, 657 F. Supp. 3d at 551 n.13, 559)).

*Johnson* has also been followed outside this District. *See Molchanoff v. SOLV Energy, LLC*, No. 23 Civ. 653 (LL) (DEB), 2024 WL 899384, at *5 (S.D. Cal. Mar. 1, 2024) (finding *Johnson* persuasive, and holding that the "EFAA 'keys the scope of the invalidation of the arbitration clause to the entire 'case' relating to the sexual harassment dispute' and 'thus does not limit the invalidation to the claim or claims in which that dispute plays a part.'" (citing *Johnson*, 657 F. Supp. 3d at 558)); *Watson v. Blaze Media LLC*, No. 23 Civ. 0279, 2023 WL 5004144, at *2, 5 (N.D. Tex. Aug. 3, 2023) (citing *Johnson* with approval and holding that because the EFAA applies, court cannot enforce the parties' arbitration agreement as to "the entirety of the case relating to the sexual harassment dispute").

Particularly apposite here is the decision in *Turner v. Tesla, Inc.*, 686 F. Supp. 3d 917 (N.D. Cal. 2023), which also involved, in addition to sexual harassment claims, federal and state wage and hour claims. There, Judge Orrick rejected an argument similar to defendants' here: that "because Turner asserts sexual harassment and non-sexual harassment claims within the same complaint, the FAA requires . . . sever[ing] the non-sexual harassment claims" so that they could be resolved through arbitration, even if the sexual harassment claims remain in federal court. *Id.* at 924–25. Citing *Johnson*, Judge Orrick held that the EFAA required finding the arbitration agreement "unenforceable with respect to Turner's entire case because the core of her case alleges conduct constituting a sexual harassment dispute." *Id.* (internal quotation marks omitted). Thus, the EFAA blocked arbitration for Turner's "workplace injury and wage claims," including under the FLSA, because these "arise[] out of the same underlying facts as her sexual harassment claims" and are thus "substantially related to her sexual harassment claim." *Id.* at 928. At bottom, he noted, both the wage and injury claims relate "to her own experience and employment at Tesla—and are intertwined with her sexual harassment claims." *Id.* at 926.

The EFAA, as construed in *Johnson* and the cases like *Turner* applying it, thus blocks the parties' agreement from requiring that Baldwin's FLSA and NYLL claims be resolved in arbitration. Those claims are part of the "case" Baldwin brings here. Defendants note that *Johnson* recognized that the EFAA may not exempt from arbitration claims unrelated to the sexual harassment claims. *See Johnson*, 657 F. Supp. 3d at 562 n.23 ("The Court does not have occasion here to consider the circumstances under which claim(s) far afield might be found to have been improperly joined with a claim within the EFAA so as to enable them to elude a binding arbitration agreement. Johnson's claims against Everyrealm and its executives all arise from his employment at Everyrealm and are clearly properly joined in a common lawsuit."). But

that does not assist the defendants in this case. Like the claims in *Johnson*, Baldwin's FLSA and

NYLL claims clearly relate, factually and temporally, to her sexual harassment claims. They all

arise from Baldwin's employment at TMPL between January 2022 and September 2023 and

relate "to her own experience and employment" there. *Turner*, 686 F. Supp. 3d at 926. They are

thus a far cry from the types of far-afield claims unrelated to sexual harassment (*e.g.*, of antitrust

or securities law violations) that *Johnson* had in mind in leaving open the possibility that the

EFAA would not apply to improperly joined claims.[5]  Thus, the plain text of the EFAA, as

interpreted and applied, decides this question against defendants.

Defendants' bid to compel arbitration of the FLSA and NYLL is also in tension with

EFAA, in that it would force Baldwin to split, between court and arbitration, her claims of injury

from workplace legal violations by her employer. That outcome would be inconsistent with

Congress's stated purpose in enacting the EFAA: to empower claims by sexual harassment

and/or assault victims that had been inhibited by proliferating arbitration clauses in employment

agreements. Such often effectively left "victims of sexual violence and harassment . . . unable to

---

[5] *Mera v. SA Hospitality Group, LLC*, 675 F. Supp. 3d 442 (S.D.N.Y. 2023), on which
defendants rely, is easily distinguished. The plaintiff there brought—in addition to sexual
harassment claims under the NYSHRL and NYCHRL on her own behalf—FLSA and NYLL
wage-and-hour claims on behalf of an FLSA collective and a putative NYLL class, consisting of
"all non-exempt employees, including servers, bartenders, barbacks, waiters, bussers, and food
runners . . . employed by Defendants." *Id.* at 448 (internal quotation marks omitted). Magistrate
Judge Aaron denied the motion to compel arbitration of the NYSHRL and NYCHRL harassment
claims, but compelled arbitration of the FLSA and NYLL wage and hour claims, finding the
EFAA not to apply to these because such group claims were not "distinct to Plaintiff." *Id.* at
448. That distinction is not present in this case, because Baldwin's claims are all brought on her
behalf only. *See* AC at 1; *see also Turner*, 686 F. Supp. at 926 (distinguishing *Mera* on ground
that "Turner's workplace injury and wage claims relate only to her own experience and
employment at Tesla"). The Court here does not have occasion to consider whether *Mera* was
correct to treat collective or class wage-and-hour claims brought against the same employer
whom the plaintiff sues for sexual harassment claims as outside EFAA's reach.

seek justice in a court of law, enforce their rights under state and federal legal protections, or even simply share their experience."  H.R. Rep. 117-234, at 3 (2022); *Johnson*, 657 F. Supp. at 561 & n.22.  And the claims defendants seek to split off from Baldwin's sexual harassment claims are ones that plaintiffs familiarly pair.  When not barred by agreements from doing so, employees have often pursued, in one lawsuit, wage, harassment and/or discrimination claims against the same employer.  *See, e.g.*, *Santana v. Latino Express Rests., Inc*., 198 F. Supp. 3d 285, 288–89 (S.D.N.Y. 2016) (claims under FLSA and NYLL for unpaid minimum and overtime wages and claims under NYCHRL for sexual harassment and hostile work conditions); *Shibetti v. Z Rest., Diner & Lounge, Inc*., No. 18 Civ. 856 (ERK) (ST), 2019 WL 11624313, at *1 (E.D.N.Y. Aug. 30, 2019) (claims for unpaid minimum and overtime wages under FLSA and NYLL and claims for sexual assault and harassment under NYCHRL).  Defendants' bid to force plaintiffs like Baldwin to pursue these sets of claims on separate tracks in separate fora would be costly, inefficient, and burdensome.  It would deter meritorious harassment claims.

The Court thus denies defendants' motion to compel arbitration.

## IV.    Motions to Dismiss

The Court next considers defendants' motions to dismiss (1) all claims, for lack of subject matter jurisdiction, under Rule 12(b)(1); and (2) the GMVPA claim against Walsh, for failure to state a claim, under Rule 12(b)(6).

### A.    Applicable Legal Standards

#### 1.    Rule 12(b)(1)

"A case is properly dismissed for lack of subject matter jurisdiction under Rule 12(b)(1) when the district court lacks the statutory or constitutional power to adjudicate it."  *Makarova v. United States*, 201 F.3d 110, 113 (2d Cir. 2000) (citation omitted).  "A plaintiff asserting subject matter jurisdiction has the burden of proving by a preponderance of the evidence that it exists."

*Morrison v. Nat'l Austl. Bank Ltd.*, 547 F.3d 167, 170 (2d Cir. 2008) (citation omitted). "[J]urisdiction must be shown affirmatively, and that showing is not made by drawing from the pleadings inferences favorable to the party asserting it." *Id.* (citation omitted). Additionally, a court may properly refer to matters outside the pleadings when considering the existence of jurisdiction on a motion pursuant to Rule 12(b)(1). *See Kamen v. Am. Tel. & Tel. Co.*, 791 F.2d 1006, 1011 (2d Cir. 1986).

### 2.    Rule 12(b)(6)

To survive a motion to dismiss under Rule 12(b)(6), a complaint must plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). A complaint is properly dismissed where, as a matter of law, "the allegations in a complaint, however true, could not raise a claim of entitlement to relief." *Twombly*, 550 U.S. at 558. When resolving a motion to dismiss, the Court must assume all well-pleaded facts to be true, "drawing all reasonable inferences in favor of the plaintiff." *Koch*, 699 F.3d at 145. That tenet, however, does not apply to legal conclusions. *See Iqbal*, 556 U.S. at 678. Pleadings that offer only "labels and conclusions" or "a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555.

### B.    Defendants' Rule 12(b)(1) Argument Based on a Challenge to the FLSA Claim

Defendants' Rule 12(b)(1) challenge—made in passing[6]—proceeds from the premise that the AC's claim of a failure to pay overtime wages required by the FLSA is too *de minimis* to

---

[6] Defendants' motion is made in the first two paragraphs of the preliminary statement of their opening and reply briefs, *see* Def. Mem. at 1; Reply at 1, and not elaborated upon in the balance of the opening brief or the reply.

support liability.  Because the FLSA overtime claim is the AC's only federal claim and the sole

basis for subject matter jurisdiction, defendants note, if it fails, the case must be dismissed under

Rule 12(b)(1).

Defendants' challenge to the FLSA claim based on the *de minimis* doctrine fails.  "The *de

minimis* doctrine permits employers to disregard, for purposes of the FLSA, otherwise

compensable work when the matter in issue concerns only a few seconds or minutes of work

beyond the scheduled working hours."  *Singh v. City of New York*, 524 F.3d 361, 370 (2d Cir.

2008) (citations and internal quotation marks omitted).  But that doctrine does not empower an

employer to "arbitrarily fail to count as hours worked any part, however small, of the employee's

fixed or regular working time or practically ascertainable period of time [she] is regularly

required to spend on duties assigned to [her]."  29 C.F.R. § 785.47.  A court considers three

factors in determining whether otherwise compensable time should be considered *de minimis*:

(1) the practical administrative difficulty of recording the additional time; (2) the size of the

claim in the aggregate; and (3) whether the claimants performed the work on a regular basis.

*Reich v. New York City Transit Auth.*, 45 F.3d 646, 652 (2d Cir. 1995).

The facts pled in the AC do not implicate the *de minimis* doctrine.  The AC cannot be

fairly read to allege merely that TMPL disregarded a few seconds or minutes of compensable

work by Baldwin beyond scheduled working hours.  On the contrary, it alleges classically viable

conduct: failures to record a worker's overtime hours and failures to compensate the worker for a

material number of such hours.  It alleges, for example, that between January and April 2022,

Baldwin "worked approximately twenty-five hours per week of floor hours but was only paid for

twenty hours," AC ¶ 176, and that during this period, her overall weekly hours regularly

exceeded 40 hours per week, qualifying her for overtime pay under the FLSA, *id*. ¶ 178.  It gives

a specific week during this period as an example: On the week of April 24, 2022, it alleges, Baldwin worked 42 hours, but was not paid overtime wages for that week. *Id.* ¶¶ 180–83. And, it alleges, as of late January 2023, defendants ceased paying Baldwin for any floor hours, of which she worked approximately 10 per week, and did not pay for her participation in photo or video shoots, *id.* ¶¶ 201–05, with the effect being that defendants failed to pay Baldwin for all her work, including overtime pay on weeks she worked over 40 hours, *id.* ¶¶ 206–08. The AC also identifies five specific weeks in 2022 and 2023 in which Baldwin participated in photo and video shoots, each lasting 1.5 hours each, but was not paid for such work. *Id.* ¶ 205.

These factual allegations plead more than *de minimis* violations of the FLSA. For the reasons above, as to the second *Reich* factor, the aggregated damages pled by Baldwin well exceed a failure to pay for "only a few minutes on occasional days"; the AC alleges that TMPL consistently ignored its obligation to pay overtime wages, failing during multiple weeks to compensate Baldwin for multiple hours of overtime work. *See, e.g.*, *Singh*, 524 F.3d at 364, 371 ("the mere carrying of inspection documents without any other active employment-related responsibilities while commuting" which amounted "to only a few minutes [of time] on occasional days" was *de minimis*); *Albrecht v. Wackenhut Corp.*, 379 F. App'x 65, 67 (2d Cir. 2010) (the "30–90 seconds" security guards spent obtaining firearms and radios is non-compensable because it is *de minimis*); *Haight v. The Wackenhut Corp.*, 692 F. Supp. 2d 339, 345 (S.D.N.Y. 2010) (holding that "the time spent donning/doffing generic protective gear is *de minimis*" because the amount of time necessary to do this—around seven minutes—is "an insignificant amount of time" such that "the practical administrative difficulty of recording the additional time would outweigh the size of the claim in the aggregate"). As to the first *Reich* factor, the AC's factual allegations do not support that TMPL was inhibited by practical

21

administrative difficulty or burden in recording these additional hours. *See, e.g.*, *Gao v. Savour Sichuan Inc.*, No. 19 Civ. 2515 (JPC), 2024 WL 664718, at *21 (S.D.N.Y. Feb. 16, 2024), *reconsideration denied*, 2024 WL 3471295 (S.D.N.Y. July 19, 2024) (finding compensable the "fifteen minutes Gao spent after each of her cashier shifts" because "it would not have been difficult to calculate that added time, particularly since she worked that additional time regularly."); *Kosakow v. New Rochelle Radiology Assocs., P.C.*, 274 F.3d 706, 719 (2d Cir. 2001) (sustaining finding that the plaintiff's "regular arrival for fifteen minutes of preparatory work would not constitute de minimis activity" because "[i]t would not be difficult to calculate, in the aggregate it constituted a significant amount of time, and it occurred regularly"); *cf. Colella v. City of New York*, 986 F. Supp. 2d 320, 344 (S.D.N.Y. 2013) (employees' inspection of vehicles found *de minimis* in part because plaintiffs "performed these activities infrequently" and away from worksites such that "it would be administratively difficult to create a system for accurately recording the time [p]laintiffs spent performing them."). And as to the third *Reich* factor, the AC pleads that Baldwin commonly worked overtime. *See, e.g.*, *Perez v. G & P Auto Wash Inc.*, 930 F. Supp. 2d 423, 431 (E.D.N.Y. 2013) (employer requiring plaintiff to regularly report to work between 30 and 40 minutes prior to car wash's opening and stay at work 10 to 20 minutes after car wash closed did not constitute *de minimis* activity); *El v. Potter*, No. 01 Civ. 6125 (RWS), 2004 WL 2793166, at *11 (S.D.N.Y. Dec. 6, 2004), *amended on denial of reconsideration*, 2005 WL 646346 (S.D.N.Y. Mar. 18, 2005) (time Postal Service employees spent in transit not *de minimis* because employees regularly spent 20 to 30 minutes in transit each day); *Sprague v. T.C. Inn*, No. 19 Civ. 1263 (LEK), 2021 WL 3617705, at *3 (N.D.N.Y. Aug. 16, 2021) (finding unpersuasive "[d]efendants' argument that [p]laintiff worked only a small amount beyond forty hours" and is not entitled to be compensated under the *de minimis* doctrine

because the work plaintiff performed "was the same type of work she performed at any other time"). In discovery, defendants will be at liberty to test the AC's factual allegations, but on the pleadings, the *de minimis* exception does not apply.

The AC's FLSA claim, which defendants do not challenge on any other ground, thus is well-pled and survives. As such, defendants' challenge to subject matter jurisdiction fails. "[T]he presence of even one claim 'arising under' federal law is sufficient to satisfy the requirement that the case be within the original jurisdiction of the district court." *T & M Meat Fair, Inc. v. United Food & Com. Workers, Loc. 174, AFL-CIO*, 210 F. Supp. 2d 443, 448 (S.D.N.Y. 2002). The Court therefore denies defendants' Rule 12(b)(1) motion.

### C.    Walsh's Rule 12(b)(6) Challenge to the GMVPA Claim

Walsh also moves to dismiss Baldwin's GMVPA claim, in which she alleges that Walsh subjected her to gender-based violence by forcibly touching her without her consent. The Court sustains this claim.

The GMVPA creates a cause of action for "any person claiming to be injured by a party who commits, directs, enables, participates in, or conspires in the commission of a crime of violence motivated by gender." N.Y.C. Admin. Code § 10-1104. The New York City Council passed the GMVPA in 2000 in response to the Supreme Court's decision in *United States v. Morrison*, 529 U.S. 598 (2000), striking the federal civil rights remedy for gender-motivated crimes contained in the Violence Against Women Act ("VAWA"). The GMVPA defines "crime of violence motivated by gender" as "a crime of violence committed because of gender or on the basis of gender, and due, at least in part, to an animus based on the victim's gender." *Id.* § 10-1103. It defines "crime of violence" as "an act or series of acts that would constitute a misdemeanor or felony against the person as defined in state or federal law or that would constitute a misdemeanor or felony against property as defined in state or federal law if the

conduct presents a serious risk of physical injury to another, whether or not those acts have actually resulted in criminal charges, prosecution, or conviction." *Id.* § 10-1103. These provisions of the GMVPA were "adopted verbatim from VAWA." *Breest v. Haggis*, 115 N.Y.S.3d 322, 326 (1st Dep't 2019).

The AC adequately pleads that Walsh committed a gender-motivated crime of violence. At the threshold, the Court begins by observing that Baldwin's claim is that Walsh's conduct constituted a "misdemeanor or felony against the person"—not a "misdemeanor or felony against property." N.Y.C. Admin. Code § 10-1104. The latter category carries the additional requirement that the "conduct presents a serious risk of physical injury to another." *Id.* But the former category—a misdemeanor or felony against the person—relied on by Baldwin does not. Accordingly, the Court rejects Walsh's argument that his alleged conduct does not qualify as a crime of violence because his conduct did not, as pled, present a serious risk of physical injury to Baldwin.

To be sure, Walsh's argument has a basis in caselaw.[7] But it is unsupported by the GMVPA's text. *See Louis Vuitton Malletier S.A. v. LY USA, Inc.*, 676 F.3d 83, 108 (2d Cir.

---

[7] Beginning in 2018, a line of cases in this District and the Eastern District of New York have recited that, to state a GMVPA claim, a plaintiff must plead: "(1) the alleged act constitutes a misdemeanor or felony against the plaintiff; (2) *presenting a serious risk of physical injury*; (3) that was perpetrated because of plaintiff's gender; (4) in part because of animus against plaintiff's gender; and [5] resulted in injury." *Hughes v. Twenty-First Century Fox, Inc.*, 304 F. Supp. 3d 429, 455 (S.D.N.Y. 2018) (emphasis added); *see also Garcia v. Comprehensive Ctr.*, LLC, No. 17 Civ. 8970 (JPO), 2018 WL 3918180, at *5 (S.D.N.Y. Aug. 16, 2018); *Doe v. Gooding*, No. 20 Civ. 06569 (PAC), 2021 WL 5991819, at *5 (S.D.N.Y. July 29, 2021); *Bensky v. Indyke* No. 24 Civ. 1204 (AS), 2024 WL 3676819, at *9 (S.D.N.Y. Aug. 5, 2024); *Doe v. New York City Dep't of Educ.*, No. 22 Civ. 07773 (OEM) (RML), 2024 WL 3553435, at *6 (E.D.N.Y. July 26, 2024); *Rossbach v. Montefiore Med. Ctr.*, No. 19 Civ. 5758 (DLC), 2021 WL 930710, at *10 (S.D.N.Y. Mar. 11, 2021). For the reasons the Court explains, however, the statutory text does not support that element (2) applies where the defendant's conduct constituted a "misdemeanor or felony against the person." N.Y.C. Admin. Code § 10-1103.

2012) ("As with any question of statutory interpretation, [the Court] begin[s] with the text of the statute to determine whether the language at issue has a plain and unambiguous meaning."). Construing the text of the definition of a "crime of violence," the "serious risk of physical injury" requirement applies only when a GMVPA claim is premised on a "misdemeanor or felony against *property*" not against "the person." N.Y.C. Admin Code § 1103 (emphasis added). That is because the "serious risk of physical injury" requirement only modifies the category "misdemeanor or felony against property." And the phrases "misdemeanor or felony against the person" and the phrase "misdemeanor or felony against property" are each introduced by the clause "that would constitute" and are separated by the word "or." This construction suggests that among the two alternative categories of predicate offenses, the qualifying clause— beginning with "if"—that contains the requirement of a "serious risk of physical injury" and that appears after the second category modifies only that category. Notably, courts interpreting the almost identical (albeit no longer operative) language in the VAWA construed it this way. *Peddle v. Sawyer*, 64 F. Supp. 2d 12, 17 (D. Conn. 1999) ("In order to state such a claim under the VAWA, Ms. Peddle must allege that the defendants committed a 'crime of violence,' which is defined as an offense constituting either (1) a felony against the person, or (2) a felony against property if the conduct presents a serious risk of physical injury to another, and would come within the meaning of state or federal offenses described in 18 U.S.C. § 16."); *Timm v. Delong*, 59 F. Supp. 2d 944, 948 (D. Neb. 1998) (same).[8]

---

[8] Although not necessary to the Court's reading, the condition that there have been a "serious risk of physical injury to another" would appear to apply to a limited subset of cases involving felonies or misdemeanors against the person, whereas it would appear to significantly narrow the range of property crimes that would come within the scope of the statute.

Accordingly, for Baldwin's AC to state a claim under the GMVA based on a predicate crime against *the person*, it must plead that: (1) the alleged act constitutes a misdemeanor or felony against the person; (2) that was perpetrated because of plaintiff's gender; (3) in part because of animus against plaintiff's gender; and (4) resulted in injury. Walsh challenges the first and third of these elements. The Court finds both plausibly pled.

As to the first element, the AC plausibly alleges that Walsh's conduct constitutes "forcible touching" which is a misdemeanor under New York state law. New York Penal Law § 130.52 provides that: "[a] person is guilty of forcible touching when such person intentionally, and for no legitimate purpose: (1) forcibly touches the sexual or other intimate parts of another person for the purpose of degrading or abusing such person, or for the purpose of gratifying the actor's sexual desire." *Id*. "For the purposes of this section, forcible touching includes squeezing, grabbing or pinching." *Id.*

The AC alleges that on the night of August 12, 2022, after Baldwin and Walsh had dinner, and they began watching a movie, Walsh inched closer to Baldwin, put his arms around her, began kissing her, reached his hands under her clothing and touched her breasts, and attempted to lower her pants, touching her vulva over her pants in the process, all without Baldwin's consent. In *People v. Guaman*, 22 N.Y.3d 678 (2014), the New York Court of Appeals held that "forcible touching," as distinct from "fleeting contact," is "any bodily contact involving the application of some level of pressure to the victim's sexual or intimate parts." *Id.* at 684. It explained that the examples set out in the statute—"squeezing, grabbing or pinching"—were "intended by the legislature to signal a low threshold for the forcible component of this crime's actus reus." *Id.* Applying this "low threshold," the Court of Appeals held that an allegation that the defendant "rubbed his groin and exposed penis against the

victim's buttocks" satisfactorily alleged "the kind or level of force required by Penal Law

§ 130.52." *Id.* at 682; *see, e.g.*, *id.* at 680, 684 (misdemeanor complaint's allegations that

defendant "rubbed his exposed penis against another man's buttocks" at a subway station facially

sufficient to support that defendant committed charged forcible touching offense); *People v.*

*Carollo*, 197 N.Y.S.3d 423, 425 (Sup. Ct. 2022) (allegations that "defendant first physically

contacted [the victim] through a hug, and then, once he was engaged in the embrace, slid his

hands down the young girl's back until he placed and rest[ed] them upon her buttocks" sufficient

to support forcible touching conviction); *People v. Gowdy*, 967 N.Y.S.2d 869, 869 (App. Term,

1st Dep't 2013) (upholding forcible touching conviction, as defendant's reaching under victim's

clothing and "rubbing" his hand "up and down the split of her buttocks" was forcible within the

meaning of the statute); *People v. Valdivia*, 980 N.Y.S.2d 278 (App. Term, 1st Dep't 2013)

(factual allegations that defendant "press[ed]" or "thrust" his exposed, erect penis against

victim's buttocks without consent sufficient for forcible touching charge).  Likewise here,

Walsh's unconsented-to reaching under Baldwin's clothing, touching her breasts, attempting to

lower her pants, and touching her vulva over her pants pleads "forcible touching" under New

York's Penal Law § 130.52(1).  Accordingly, the AC adequately pleads the first two elements:

that Walsh committed the misdemeanor of forcibly touching Baldwin's "sexual or other intimate

parts" for "the purpose of gratifying [his] sexual desire."[9]  *Id.*

Walsh responds by arguing, factually, that Baldwin consented to his actions.  Walsh is

correct that New York Penal Law § 130.05 makes a lack of consent a necessary element of

"forcible touching."  It provides:

---

[9] Walsh does not dispute that, as pled, his purpose in touching Baldwin was to "gratify[] [his] sexual desire."  *See* Def. Mem. at 8.

(1) Whether or not specifically stated, it is an element of every offense defined in this article that the sexual act was committed without consent of the victim.

(2) Lack of consent results from: (a) forcible compulsion; or (b) incapacity to consent; or (c) where the offense charged is sexual abuse or forcible touching, any circumstances, in addition to forcible compulsion or incapacity to consent, in which the victim does not expressly or impliedly acquiesce in the actor's conduct.

*Id.* § 130.05(1)–(2).  But, the AC's allegations, which on a motion to dismiss must be taken as true, support that she did not consent, expressly or impliedly, to Walsh's conduct.  It alleges that Baldwin did not verbalize or otherwise outwardly express consent, and it does not recite facts supporting implied consent.  On the contrary, it alleges that Baldwin was an unwilling participant, and that she conveyed her lack of interest in contact with Walsh in various ways, including by only agreeing to watch the movie after he firmly insisted, sitting far away from him, and rising and asking to leave once Walsh started touching her.  On the pleadings, these allegations are sufficient to plead the absence of consent.

As to the third element, the AC adequately pleads that Walsh's conduct was motivated in part because of "animus based on the victim's gender."  N.Y.C. Admin. Code § 10-1103.  After the enactment of the GMVPA, courts "struggled with how to determine defendants' motivation and animus."  *Doe v. Olive Leaves, Inc.*, No. 18 Civ. 5734 (HG) (TAM), 2024 WL 3048373, at *11 (E.D.N.Y. Feb. 16, 2024).  Some interpreted gender animus to require that plaintiffs "show extrinsic evidence of the defendant's expressed hatred toward women as a group"; others "applied the totality of the circumstances analysis borrowed from Title VII" requiring that gender-based animus be shown through "actions and statements by the perpetrator during the commission of the alleged crime of violence."  *Breest*, 115 N.Y.S.3d at 328–29 (collecting cases).  Recently, however, in *Breest*, the Appellate Division clarified that allegations of rape and sexual assault state a claim under the GMVPA because "[m]alice or ill will based on gender is

apparent from the alleged commission of the act itself." *Id.* at 330.  It explained that "[r]ape and sexual assault are, by definition, actions taken against the victim without the victim's consent"; and "[a]nimus inheres where consent is absent." *Id.*  Courts in this District have recognized *Breest*'s significance on this open doctrinal point.  *See, e.g.*, *Doe v. Gross*, No. 23 Civ. 6325 (JPC), 2024 WL 3729007, at *8 (S.D.N.Y. Aug. 7, 2024) (recognizing that "[t]he New York Supreme Court's Appellate Division, First Department, recently has clarified . . . that where rape and sexual assault are alleged, malice or ill will based on gender is apparent from the alleged commission of the act itself" and applying *Breest's* holding (internal quotation marks omitted)); *Doe v. New York City Dep't of Educ.*, No. 22 Civ. 07773 (OEM) (RML), 2024 WL 3553435, at *8 (E.D.N.Y. July 26, 2024) (same); *see also Pearson Cap. Partners LLC v. James River Ins. Co.*, 151 F. Supp. 3d 392, 411 (S.D.N.Y. 2015) (federal courts are "bound to apply the law as interpreted by a state's intermediate appellate courts unless there is persuasive evidence that the state's highest court would reach a different conclusion").  In light of *Breest*, the AC's allegations that Walsh forcibly touched Baldwin sexually without her consent necessarily pleads gender-based animus on Walsh's part.

## CONCLUSION

For the foregoing reasons, the Court denies defendants' motion to compel arbitration and motions to dismiss.  The Clerk of Court is respectfully directed to terminate the motions at Dockets 16 and 20.

Pursuant to Rule 12(a)(4)(A), defendants must answer the Amended Complaint by September 3, 2024.  By separate order, the Court will schedule an initial pretrial conference.

SO ORDERED.

_____
Paul A. Engelmayer
United States District Judge

Dated: August 19, 2024
      New York, New York